Vance Gardner v. MeTV is next up for argument. Mr. Segman. May it please the Court, my name is Mark Segman and I represent the plaintiffs in this case. Your Honor, as this case is controlled by the plaintext... We need to start with subject matter jurisdiction. Your brief treats MeTV, a partnership, as if it were a corporation and asserts diversity jurisdiction under Section 1332D. Do we have jurisdiction under 1332D? I believe there was a supplemental assertion of jurisdiction. Your supplemental filing still treats it as a corporation with a place of organization and a principal place of business. A partnership is not a corporation. The citizenship of every partner matters, right? MeTV filed a supplemental statement saying we are not a corporation, we're a partnership. We don't think there is diversity jurisdiction. You didn't respond to that. This is your opportunity. Your Honor, I believe there would be federal question jurisdiction under the VPPA itself, regardless of whether there is diversity jurisdiction. I wish you would not use initialisms. Using real words would help. I apologize. But are you abandoning your attempt to invoke 1332D? Yes, Your Honor, because we trust... I have no reason to disagree with MeTV's assertion of the citizenship of its partners. And I apologize for the initial brief, not asserting the correct basis of jurisdiction. It's really important. We stress more often than we care to think. The Supreme Court stresses that a partnership has a special set of rules. Okay, let's proceed on the understanding that if there is federal question jurisdiction or there is no jurisdiction. Thank you, Your Honor. And again, I apologize. And I do recognize the critical importance of that, especially in the Seventh Circuit. So here, this case is controlled by the plaintext of the Video Protection Privacy Act. And the district court below never truly grappled with that plaintext. Instead, it primarily cited other district court decisions, which also did not truly grapple with that plaintext. Instead, largely what they did was claim that the sky would fall if the statute were simply applied as written. But that is not true. MeTV aptly claims that the statute here is a scalpel and not a chainsaw. And I fully agree with that, but not for the reasons that they say, because of the definition of personally identifiable information, which is really what the statute is about. It is all about protecting the information about what video someone is watching. And that is a limited definition, as the Nickelodeon Court recognized, and that's the definition that creates the scalpel. It just so happens that in this case, that's exactly what the metapixel is transmitting, is my client's personally identifiable information, specifically the actual videos that they're watching. So the only thing at issue on appeal now is the definition of the word consumer. It's undisputed on appeal that MeTV is a videotape service provider. So that leaves only two things to show, that the plaintiffs are subscribers of goods and services from MeTV. I think it's clear that they subscribe to goods and services, and so the issue is whether they are a subscriber. I think that it's, to my mind, relatively clear under the Ellis factors that the 11th Circuit announced, and just under sort of more general principles of common sense, that my clients here are, in fact, subscribers. As the 11th Circuit noted, there's a commitment, there's a relationship. They provided their private information, which is a form of payment in the Internet. There doesn't need to be money. And so they subscribe to something. If I send to Time Incorporated my email address for the purpose of alerting me to new articles in Time, have I become a subscriber to Time Magazine? If you just sent your email address to them, I want to know. Send them my email address, and I check a box that says, please send me important stories about, well, what could be more important than the 7th Circuit? So they will send me a story. They'll send me a link every time they publish a story about the 7th Circuit. Am I now a subscriber to Time Magazine? Probably not in that case. I mean, I would distinguish this case from that because my clients did more than just provide their email address. Oh, suppose they send me an email, and I actually read an article about the 7th Circuit. Have I subscribed to Time Magazine? If you also agree to terms of service, that binds you, creates obligations to you, and a bunch of other things that exist here. You cannot send an email to anybody in the Western Hemisphere without subscribing to terms of – without agreeing to terms of service. I think that if you get a login and a username to Time Magazine that you then use to, you know, to see certain information, if you can then interact with the Time Magazine website and make comments and post replies. I can interact with the Time website without sending them my email address. And, of course, this is MeTV's central argument. Anybody can watch the videos on their website with or without sending them any information. Well, you can't watch it without sending them information about your IP address because otherwise they don't know where to send the video. But you don't have to do that, right? And that's true of Time. That's why I picked that example. Your Honor, I agree. I mean, it is undisputed on the record that you can go to the website and watch videos without having any subscription. Our claim is based on the idea that they subscribed here. Is there a problem that there are really two different platforms at issue here? MeTV's got all this stuff on TV, okay? And then they've got these videos on their website. And all the examples of subscription for your client that you're pointing to have to do with their relationship with what's happening on TV. Is that at all relevant for us to consider? It's not relevant, and that is a misstatement of the record, not by Your Honor, but a misunderstanding of the record. We never allege that the video-related benefits here related only to the prerecorded videos and not to the live feed. And some of the benefits that we allege relate to the videos that my clients watch, like communicating with other subscribers, posting, responding to comments, getting the e-mails and alerts. Furthermore, there is a live feed on the MeTV website of MeTV. So you can watch MeTV over the air, like literally over the air on an antenna. But you can also go to the website. There's a thing that's showing what's being broadcast. And so to the extent to which those… And can anybody watch that live TV? Yes, anyone can watch anything on the MeTV website. Not just your clients? Correct. Okay, so back to my understanding of the record. The examples of their subscription tentacles that you've pointed to, the things that happen after they provide their e-mail and their zip code, it gets them access to television. They can create a television watch list, right? Yes. They can make comments on the website. Correct. And so is your point back to me for something like the comments on the website? It could be comments on the videos that they watch? Right. Help me understand how many of those subscription benefits that we've just been talking about are related to the video content on the website. And you mean the pre-recorded videos or the live feed, but not anything coming over the air? You got it. Right. So the ability to communicate with other subscribers of the posting, responding to comments, to receiving, quote-unquote, trivia game invitations, setting up the alerts, including alerts about shows they may be interested in. The alerts are for things on broadcast air, right? Not alerts to videos on the website? No, they are on the videos on the website. Okay. And what I'm saying is that then there's a category of other things that ostensibly apply only to the over-the-air things like using a channel finder. But what I'm saying is that that live feed exists on the website as well. Okay. So I think that even all those things that you could say only apply over the air apply just as well to watching the videos on the website because you can watch it there as well. Now, again, I mean, to judge Eastbrook's question, I understand your – I feel your concern that there needs to be some sort of affiliation here. I admit that if a random person goes to a website and watches a video, I mean, I don't like the fact that if I do that they can tell everyone in the world what videos I'm watching. But I accept that because I have no relationship with them. But if I go to MeTV and I put in my username and zip code, email address, age, gender, NGO location, I expect that I have some sort of relationship with that. And at that point, I think that I am close enough to the Judge Bork example of D.C. in 1986 or whatever that they should not be telling everyone in the world who my videos are. I think that's enough of a connection. And I will just note this. One of the Ellis factors was exclusive access to video. I must say you're sounding like you're asking us to legislate from the bench about what's a good result. We're just trying to construe the word subscription or subscriber, and that has an ordinary usage. It would be more helpful to me, at least, if you have some other means of getting at the ordinary way in which subscriber is used. Now, I ask my hypothetical because there's an ordinary understanding of what it means to subscribe to Time magazine, and signing up for emails isn't it. Now, maybe there's some competing understanding of subscriber that we should be thinking about. But the general question, what should video providers do, all things considered, is for a different branch of government. I would just respond. I would urge the Court to apply the Ellis factors. Those are reasonable factors to me about who is a subscriber, and one of those factors is exclusive access to videos. That is one factor, not dispositive. And here, the trial court pretty much held without exclusive access, you're not a subscriber. If there are any further questions, I'll sit. Thank you. Certainly, counsel. Mr. King. Good morning, Your Honors. Please, the Court. Kevin King for Appellee MeTV. Judge Easterbrook, I'd like to start with jurisdiction. You are correct from our perspective that there is not diversity jurisdiction in this case. We did acknowledge, however, in our appellee brief that there would be federal question jurisdiction. It looks like 1331 supplies jurisdiction. I mean, the statute that everybody is talking about supplies a remedy, right, 2710. But the jurisdiction seems to come from 1331. Anyway, let's agree with that, Your Honor. Moving past that, and maybe Judge Jackson, cue me to pick up on your call clue with my colleague opposing counsel. I just want to clean up a few things about what is and is not alleged in the amended complaint. The amended complaint, as far as we're aware, does not allege that there's a live stream of MeTV's broadcast on the Internet. I want to make that very clear. There are short clips and episodes and things like that, a small smattering of them on the website, but it's not as though you can go on MeTV.com and see what's over the air right now. That's not an option. It's not alleged here. As to the benefits that opposing counsel invoked, it's telling that the amended complaint does not allege anywhere that the plaintiffs were logged into their MeTV online accounts when they watched these videos, and that shows that the accounts are separate. Counsel, let me back up. Is it alleged that the plaintiffs subscribed to your email service? Take the videos apart. Have they subscribed to email updates? It is alleged that they may have received emails in certain circumstances, and, Your Honor, I'd point you just to cite chapter and verse here to page 35 of the supplemental appendix where they mention emails. It's not very clear what those emails would involve, but there was no allegation, Your Honor, of a subscription to emails. There's no newsletter here, for example. So what is the reasonable inference then? Is one of the goods or services email updates that are provided? No, Your Honor, and there are several reasons for that, but one of the reasons for that is that you need to read the statute as a whole and in light of its context so that all of its pieces fit together harmoniously. This is what the district judge said in the Carter case versus Scripps Network. I'd point you to that. Just back up here. Are there allegations that one of the things that MeTV provides are email updates? It is alleged that there could be email alerts in certain circumstances, but I don't think it goes any further than that. And so maybe just to continue with what I was saying about reading the statute as a whole, methodology really is at the core of this case. How do you read the Video Privacy Protection Act? And as the district court held here and as dozens of other decisions have held nationwide, when you read the statute as a whole, it's apparent that a consumer is someone who subscribes or obtains particular kinds of goods and services, audiovisual goods and services. And the first step in that analysis. So, counsel, let's stop there because you just added words, right? The statute itself doesn't say particular kinds of goods or services. It could. When it was talking about goods or services, it could have said video-related goods or services. I don't see that in the statute. Your Honor, it is true that in A1, the consumer definition, it doesn't say video goods or services, but that would have been redundant because A1, the consumer definition, incorporates the videotape service provider definition. It says goods or services, not just any goods or services, but goods or services from a videotape service provider. And so if you move down to A4, the provider definition, what you see is providers are defined as enterprises that are involved in the business of rental, sale, or delivery of a particular kind of good or service, videotape cassettes, or other audiovisual materials. And so when you put those two things together, what you get is someone as a consumer, if they purchase, rent, or subscribe to videotape cassettes or similar audiovisual services. That's what you do when you read the statute as a whole and put the pieces together, as Judge Castell did in Carter, as the district judge did below, and as dozens of other district courts have done nationwide. But you don't need to rely just on that. The statutory context supports the district court's rationale as well. If you look at the consumer and provider definitions, they have a parallel structure. The consumer definition refers to a renter, a purchaser, a subscriber, whereas the provider definition refers to rental, sale, or delivery. The fact that they have this parallel structure suggests that they cover the same territory. Beyond that, the district court's approach causes the word service to mean the same thing, both times it appears in the consumer definition, which refers initially to goods or services, and then just a few words later to a videotape service provider. The district court's symmetrical approach would cause service to mean the same thing both times, video service. The appellant's interpretation, in contrast, would not. It would cause the word to mean different things in the space of just six words. As the district court observed in the Heather case, that's usually not how we read statutes. There's also a more fundamental point here, and Judge Easterbrook, your questions go to that, is this is about whether or not they were a subscriber to the goods or services provided by a videotape service provider. But even before you get to that, there's a question, are they a subscriber at all? And as we argue in our brief, the answer to that is no. You don't have the kind of durable commitment and relationship here between the appellants and MeTV that you have when you have a subscription to something like Time Magazine. And, Your Honor, for the definition of what does it mean to be the ordinary understanding of subscriber, Judge Easterbrook, we would agree with the understanding that you gave. And if you want to go further on that, I do agree that the Ellis case is the right reference point there. They refer to a number of dictionary definitions from the time that the Video Privacy Protection Act was enacted. It's just that we draw a different view. But there are older dictionary definitions and common usages. You agree, I trust, that John Hancock subscribed to the Declaration of Independence, even though he didn't pay Thomas Jefferson any money and didn't furnish his e-mail address either. He did not, Your Honor, that's right. There are all sorts of uses of the word subscribe. Yours seems influenced by the fact that what follows is goods and services, right? I take it your suggestion is that the way one subscribes to goods and services is for money to change hands, like my ordering a year's subscription to Time. But I wonder whether that's the only possible economic meaning of subscribe. Your Honor, we would acknowledge that that is not the only possible meaning of subscribe, that there could be, the case law says this and we don't disagree with it, there could be a subscription that would involve something other than payment of money. Maybe you would volunteer for certain activities or you would give away other property that you have in some intentional and durable manner, something that's different than what we have here. I subscribe to the platform of the Libertarian Party, for example. Certainly, Your Honor. But I think once you put the other pieces of the puzzle into place here, once you look at what comes next from a videotaped service provider, and you look at the rest of the statute, and you look at common sense, which this Court has looked to in the Stirk case in the past, and you think everything else in this statute is about video. So it makes sense in context to understand goods and services that way as well. The impetus for this statute was the disclosure of Judge Bork's rental materials, and those were video materials. Everything, everything when you look at the statute as a whole is about video, so it just makes sense as a matter of common sense to understand goods and services that way as well. I do want to point out some problems that would arise if you read the statute as the appellants do. One of them is that it would lead to these anomalous results. If you had two people, one with a MeTV online account, which is separate from video content, and another who doesn't have that account, and they watch the same video at the same time, and their privacy interests were affected in exactly the same way, under appellant's theory, only the person who had this optional separate account would have a claim, whereas the other person would not. As the District Court pointed out in the Brown v. Learfield decision, it just makes no sense to read the statute in that way. So that's one point. And would you have had more information about the individual who had an account? No, Your Honor, you would not, and that's a critical point here. There is no allegation that the plaintiffs were logged into their accounts when they watched the videos, so there was no way for MeTV or anyone else in the world to know that they had an account when that happened. But beyond that, there's also no allegation in this case that the information that was provided when they signed up for these separate accounts, that that somehow was provided up to Facebook. So I think there really is no additional information that would be covered there. I do also want to mention— What's wrong with viewing that as, since they provided e-mails and zip codes and, you know, any other information, therefore they're owed a little bit more from this provider than the person who just watches the stuff on the website without having created even that small bit of a relationship with MeTV? Well, I think that's a reasonable policy consideration, Your Honor, and if we were here in Congress, I would say, you know what, that might make some sense. But the way Congress has written this statute here, where you need to be a subscriber to goods or services from a videotape service provider and provider is defined in the way that it's defined in A4, a specific class of products, I don't think that works, Your Honor. And so for all these reasons, we would urge that the judge— Suppose, in addition to doing what the plaintiffs did, MeTV had a sideline selling cheese and they sign up for a monthly shipment of cheese, making them, say, a subscriber to cheese, which is a good or service. Do you think that would also mean that they were a subscriber for purposes of this statute? No, Your Honor, and that is the critical distinction. Under the appellant's interpretation, goods or services mean the entire economic output of society, which would include cheese. And yet there's no evidence that when Congress was creating this statute that they had anything other than a video relationship in mind. The judgment should be affirmed. It's not a question of what they had in mind. It's a question of what they enacted. It just says goods or services. We agree that cheese is a good, particularly in Wisconsin, but mostly in the rest of the world. So if you subscribe to a monthly shipment of cheese, doesn't that just get you in? I understand there's no cheese involved in this case, but we have to figure out where these arguments are going.  So subscribing to cheese does not get you in here because the statute, when you read it as a whole, when you look just at the phrase goods or services, yes, cheese is a good or service in the abstract. But when you plug those words into the consumer definition, when you look at the provider definition, when you look at all the rest of the statute, it is apparent, just as it was in the Dolan case cited in our brief, if I'd point you to that, where the Supreme Court declined to read a word all the way out to its outer limits of definitional possibilities here. Thank you, Your Honors. Thank you, Mr. King. Mr. Sigmund, we kept Mr. King up a little extra time. I'll give you a minute for rebuttal. Thank you, Your Honor. Just one real quick point of clarification to Your Honor's question about the live TV feeds. Just to clarify, our complaint never used the word live TV feed. It said that the plaintiffs watched prerecorded videos on the website. The prerecorded videos take two forms. One is you can go out and click on, grab, and then the live TV feed. The feed is showing prerecorded videos. I mean, they're just showing like old movies and old television shows is what MeTV does. And so I think a fair reading of the complaint encompasses my clients clicking on videos and then watching what's on the feed. Other than that, Your Honor, Judge Easterbrook, I totally agree. I did not ever mean to go into what did Congress really mean here. I didn't mean to slide into that. I was just addressing their arguments that the sky is falling. I don't think it's going to fall because of what Congress enacted. But, yes, I agree. I pointed out that MeTV only does TV. But if they did cheese, yes, they would be a subscriber of goods or services. Then only their information about videos would be protected. And so there is no problem here, but who cares about that because the text applies. So the defendant could tell people exactly which cheese I prefer, but not which videos. Unless there was a video about cheese, yes. Okay, I think that's enough. The case is taken under advisement.